*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* JOEL M. ENGEL, LMSW.

BUREAU OF PROFESSIONAL LICENSING,

       Petitioner-Appellee,

v

JOEL M. ENGEL, LMSW,

       Respondent-Appellant.

UNPUBLISHED
August 27, 2019

No. 345169
LARA Bureau of Professional
       Licensing
LC No. 17-011506

Before: M. J. KELLY, P.J., and MARKEY and GLEICHER, JJ.

PER CURIAM.

Respondent Joel M. Engel, LMSW, appeals by right a final order issued by the Michigan Board of Social Work Disciplinary Subcommittee (the subcommittee). The subcommittee accepted the findings of fact made by the hearings examiner in his proposal for decision, accepted in part and rejected in large part the examiner's conclusions of law, placed Engel on probation for one year, and fined him $2,000. The examiner and the subcommittee concluded that Engel violated the Public Health Code, MCL 333.1101 *et seq*., and specifically MCL 333.16221(i) (failure to comply with a subpoena). The subcommittee further determined, contrary to the examiner's legal conclusions, that Engel was also subject to discipline pursuant to MCL 333.16221(a) (negligence or failure to exercise due care), (b)(*i*) (incompetence), and (h) (engaging in prohibited conduct involving dual relationship with client). We affirm the subcommittee's decision that Engel failed to comply with a subpoena under MCL 333.16221(i), but we reverse the subcommittee's conclusions regarding MCL 333.16221(a), (b)(*i*), and (h).

## I. FACTUAL AND PROCEDURAL BACKGROUND

There is no dispute regarding many of the facts in this case. The legal implications of those facts, however, were hotly contested. At all relevant times, Engel was licensed in Michigan to practice as a licensed master's social worker (LMSW), he had a private practice at

Behavioral Health Group of Muskegon, LLC (BHG), he was a BHG member, and Engel Properties Associates, LLC, of which Engel was the sole member, owned the building rented by BHG. From April 22, 2014, to June 10, 2014, Engel, as a volunteer instructor, taught a parenting class that was attended by TH and TH's girlfriend, CS. The couple had three children together. The parenting class was offered and operated by Love, Inc., which was the record keeper for the class. There was no indication or claim that Engel held an interest in Love, Inc. The class was conducted at the offices of BHG.

Engel testified that he learned during the class that TH and CS each had a history of abusing drugs. The Michigan Department of Licensing and Regulatory Affairs (LARA), along with LARA's expert, viewed TH and CS as being Engel's social work "clients" in light of the parenting class.[1] Absent consideration of the parenting class, there was no dispute that TH and CS were not Engel's clients at the time of the class for purposes of his social work practice. Engel took the position that teaching the parenting class did not constitute the licensed practice of social work.

During the course of the parenting class, Engel himself had replaced a door in the building, and TH, being aware of this, indicated to Engel that TH could have done the work for Engel. Toward the end of the class, TH asked Engel if there were any construction projects that needed to be done. TH, who had an extensive background in the construction field, made the inquiry because he currently did not have any work or income and was somewhat desperate. In June 2014, Engel authorized TH to relocate a sink fixture in the building. TH properly performed the job without incident.[2] Later in June of 2014, TH and CS met with Engel. They sought services from Engel in his capacity as a social worker. Engel obtained releases and gathered information on the couple in order to make an informed decision on whether to provide services. Engel reviewed a report regarding a full psychological evaluation conducted of TH in January 2014 relative to child protective proceedings. The report revealed that TH had a history of drug abuse and that he had a fairly extensive juvenile and adult criminal record. Engel concluded that he could not act as social worker for both TH and CS because of potential conflicts. Engel formally became CS's social worker on July 1, 2014, and Engel referred TH to another social worker at BHG, Valerie Porenta, who began providing him with services in mid-July 2014. As part of counseling CS, Engel would occasionally have TH participate in the sessions, while making clear to TH that CS alone was his client.

In September 2014, a car crashed into the front of the building occupied by BHG, knocking down a wall to a waiting room. Engel immediately reached out to TH, asking him to secure the building, which TH accomplished. Thereafter, Engel entered into an agreement with TH to repair the damaged building. For the work, TH agreed to accept whatever amount the insurance company paid on the claim for damages. TH successfully completed the project without incident.

---

[1] LARA eventually filed an administrative complaint against Engel by and through the director of the Bureau of Professional Licensing (the bureau).

[2] It appears that TH did the work after the parenting class had ended.

On October 20, 2014, TH had his last session with Porenta. In December 2014, BHG was in the process of adding a new member, bringing the number of members in the limited liability company to three, including Engel.[3] The other two members were physician assistants (PAs), Dana Cochrane-Hoekstra and David Wilkins. Cochrane-Hoekstra had joined Engel as a member back in May 2014, and Wilkins was the new member. In anticipation of Wilkins's arrival, a remodeling project was planned for the north side of the building, which was where Wilkins's office would be situated; the south side of the building housed Engel's and Cochrane-Hoekstra's offices. BHG received three bids for the remodeling project, one of which was from TH. The members unanimously voted to award the project to TH. According to Engel, the project was awarded to TH because "his bid was lowest," and his earlier construction work "was very good." The remodeling project took TH a couple of months to complete, and there were no issues with the workmanship.

During the construction, Engel had provided TH with a key to the north side of the building. Engel informed the other two members that he had given the key to TH. In December 2014, while the remodeling work was being performed, CS was discovered using a phone in a receptionist's office without permission. CS apparently accessed the south-side office outside of normal business hours by entering the building through the north side and then going through an unlocked interior door. According to Engel, if one made entry through the north side of the building, the only way to access the south side of the building would be through interior doors that were supposed to be locked by the last person out of the building. Engel claimed that the office manager was responsible for making sure employees were aware of the need to lock interior doors at the end of the day. Cochrane-Hoekstra testified that there were "many doors in the building that you could go through and get to our [south] side." A former BHG receptionist asserted that there was no protocol with respect to locking interior doors. Cochrane-Hoekstra stated that there was an expectation that last-to-leave employees lock interior doors.

Engel confronted TH and CS and warned them that CS's action was not acceptable or permissible. Engel admitted that client files and medical records were kept in the room where CS was found using the phone, but there was no evidence that CS actually accessed files or records. We also note that there was no testimony regarding whether the files and records were unsecured in the office or secured in locked cabinets. In answering the administrative complaint, Engel had alleged that "all client information was stored in locked file cabinets." Cochrane-Hoekstra testified that she spoke to Engel regarding the phone incident and concerns about TH's having a key. She was worried about patient privacy rights and potential HIPAA violations, yet Engel did nothing. Engel denied having such a conversation with Cochrane-Hoekstra. There were no further incidents during the remodeling project.

On March 12, 2015, CS had her last social work session with Engel. In September 2015, TH approached Engel looking for more work. TH suggested that Engel have the roof replaced. Engel believed that the roof was going to need replacing soon although there was no immediate need. Nevertheless, Engel "decided to give [TH] an opportunity to make some money because

---

[3] We note that BHG had nonmember social workers.

he needed the work." The construction project was to include replacing the roof and some other exterior improvements. TH began the project and often worked on the building after normal business hours. TH was given a key to the building's main entrance and to a waiting room, which also provided access to a hallway and kitchen area. Engel testified that he gave TH the key so that he could store materials and tools inside the building. Sometime in October 2015, after the exterior project was commenced, TH was discovered by PA Wilkins one morning sleeping in a back office located on the north side of the building. CS was also found in the office, along with food and various personal belongings, including blankets, clothing, and multiple pornographic DVDs. Cochrane-Hoekstra testified that she could hear Wilkins yelling upon his discovery of TH and CS in the office.

Engel contended that the office was not being used by BHG at the time, that Engel had not given permission or authorization for TH or CS to stay or sleep in the room, that TH could only have accessed the office by virtue of Wilkins's staff failing to lock interior doors the night before, and that Engel immediately terminated the contract with TH, and hired a different contractor to complete the exterior project.[4] There was testimony that prescription medications, controlled substances, a medical records were kept on the north side of the building as part of Wilkins's practice. And Engel acknowledged that he was aware of the fact that prescription medications and records were located in that area. Engel explained that he became aware that medications would be stored on the north side of the building when the remodeling of the north side was being done because he had to "make sure that there were locked closets where the . . . medications would be . . . kept." There was no testimony that the medications and controlled substances were not in secured or locked cabinets or closets. We also note that there was no evidence that TH or CS actually accessed any medications or controlled substances. Cochrane-Hoekstra, who noted that she once saw TH in jail, testified that she spoke to Engel regarding the incident, setting forth her concerns about TH's having access to the building and narcotics. Engel denied any such conversation, and he claimed that neither Cochrane-Hoekstra nor Wilkins asked him to terminate TH's employment after the earlier phone incident or the most recent intrusion.[5]

While TH was still working on the roofing and exterior project in the fall of 2015 and before TH and CS were found sleeping in the north-side office, TH went to Engel and asked for cash for lodging because TH and CS had no place to stay. Engel was not prepared to give TH cash, but he did agree to cover the cost of a nearby motel, which amount would be deducted from the pay owed to TH for the construction project. Engel testified that either he or his wife actually went to the motel and paid for a room for TH and CS using a personal credit card; at no time did TH or CS physically possess the credit card. According to a bureau investigator, Engel informed the investigator that there were allegations that CS engaged in prostitution in the motel room and that drug dealing was also occurring in the room. Engel testified that he learned from

---

[4] The former receptionist asserted that TH did some additional exterior work on the building after the incident.

[5] With respect to the various construction projects TH performed, Engel testified that it was technically Engel Properties or BHG that employed and paid TH.

-4-

the motel's manager about the alleged prostitution after the motel stay was over. The manager also told Engel that TH and CS were asked to leave the motel. Engel believed that they were asked to leave the day before TH and CS were found sleeping in the office. There was no evidence that Engel knew at the time he supplied payment for the motel that TH or CS might engage in criminal acts might at the motel. In LARA's administrative complaint, it alleged that motel personnel kicked TH and CS out of their motel room on October 8, 2015, because CS was committing acts of prostitution. We note that aside from hearsay, there was no evidence that CS engaged in prostitution. On December 4, 2015, Engel accepted TH as a client within the purview of Engel's practice as a social worker. According to Engel, TH's life was in shambles and CS had left him.

As part of an investigation, the bureau mailed a subpoena to Engel that was dated February 7, 2016, requesting all records pertaining to TH's treatment from January 1, 2015, to November 30, 2015. On February 23, 2016, Engel phoned the bureau, explaining that TH was not his client during the period covered by the subpoena, January 1 to November 30, 2015, although TH later became his client. Engel testified that he was informed by the bureau that a second subpoena would be sent. On February 29, 2016, the bureau allegedly mailed another similar subpoena to Engel but one without any limitations on TH's treatment dates. The bureau claimed that Engel did not respond to the subpoena. The bureau then allegedly faxed the second subpoena to Engel on March 14, 2016, after a phone conference that day between Engel and the bureau. Engel denied receiving the second subpoena, either by mail or fax, and he denied even speaking to anyone from the bureau on March 14, 2016. Engel testified that Cochrane-Hoekstra and Wilkins moved out of the building on February 26, 2016, taking the fax machine and Engel's phone system. Engel claimed that "[t]hey took everything."

Contrary to Engel's testimony, a bureau investigator responsible for subpoenas testified that he spoke to Engel on March 14, 2016, which was the production due date for the second subpoena, obtained Engel's fax number,[6] and then faxed the second subpoena to Engel. The investigator logged and documented these events, but no fax transmittal confirmation was produced.[7] A regulation agent for the bureau who was investigating the matter conducted an interview of Engel at BHG on June 15, 2016. The regulation agent testified that Engel informed him that he had indeed received both subpoenas. In connection with the second subpoena, Engel told the agent that Cochrane-Hoekstra, who he claimed had permanent control over the electronic records, had moved out of the building, taking the records.[8] The regulation agent indicated that Engel then stated that he might have some paper records in his office. The agent asked Engel to check the office, and Engel did so, finding 22 pages of documents pertaining to TH, including

---

[6] Engel acknowledged that the bureau had the correct fax number.

[7] The investigator claimed that no error or failure code was generated when the fax was sent and that there had been a transmittal confirmation, but he did not bring any paperwork to the hearing.

[8] Cochrane-Hoekstra testified that BHG had been using a computer record-keeping program called Valant that was licensed to her. She claimed that through their respective attorneys, Engel had been offered the electronic records concerning Engel's clients.

ten pages related to the parenting class. Engel testified that the first time he ever saw the second subpoena was at the June 15, 2016 interview with the regulation agent.

In September 2016, LARA filed the administrative complaint against Engel. Count I of the complaint alleged that Engel's conduct in hiring TH for construction projects, giving him access to the building, and paying for the motel evidenced a violation of a general duty, reflecting negligence and a failure to exercise due care. Count I was based on MCL 333.16221(a). Count II alleged that Engel's conduct constituted incompetence, considering that it showed a departure from, or failure to conform to, minimal standards of acceptable and prevailing practice for the health profession of social work. MCL 333.16221(b)(*i*) and MCL 333.16106(1) formed the basis of Count II. In Count III, LARA alleged that Engel's conduct revealed involvement in a dual relationship with a client or a former client in which there was a risk of exploitation or harm to the client. Count III was predicated on MCL 333.16221(h) and former Mich Admin Code, R 338.2909(c). Finally, Count IV alleged that Engel failed to comply with a subpoena in violation of MCL 333.16221(i).

On September 21, 2017, an evidentiary hearing was conducted on the administrative complaint. A hearings examiner presided over the proceeding. LARA called six witnesses to the stand, including Engel. Engel later testified again as part of his defense, and he also called one additional witness—the LMSW who had provided social work services to TH following Engel's referral, Valerie Porenta. LARA's witnesses, aside from Engel, consisted of the bureau investigator in charge of the subpoena process, the bureau regulation agent who interviewed Engel in June of 2016, the former receptionist at BHG, PA Cochrane-Hoekstra, and an LMSW who was qualified by the examiner as an expert in the field of general social work, Constance Black-Pond. TH, CS, and Wilkins did not testify at the hearing.

Black-Pond testified that the parenting class could well have created a social worker/client relationship between Engel and TH and CS given the risk of the couple's perceiving the existence of such a relationship based on Engel's status as a professional, the materials used in the class, and the issues they discussed especially if TH and CS had direct conversations with Engel about their life circumstances. Black-Pond also opined that the intake meeting that Engel had with TH and CS in June 2014 when they sought a social worker could be viewed as forming a social worker/client relationship. She also noted TH's participation in counseling sessions involving Engel as CS's social worker.

Black-Pond testified that the business relationship between Engel and TH was problematic because of the potential for a conflict of interest. She asserted that it created a power base related to income, where TH was fundamentally without power and vulnerable if the work were deemed unsatisfactory. The vulnerability aspect was concerning to Black-Pond because TH is bi-polar, has PTSD, and difficulty managing stress. The business relationship and the social worker/client relationship also created a dual relationship that presented a danger of boundaries being crossed and a risk of harm to TH. Black-Pond observed that not all boundary crossings are unethical; it depends on the risk of harm. And the risk here could have been minimized by discussing boundary issues with TH, but there was no indication that Engel had such a discussion with TH. Black-Pond conceded on cross-examination that she did not know the nature of every discussion between Engel and TH. Further, according to Black-Pond, Engel should have consulted with other professionals about the dual relationship and boundary issues,

which apparently did not occur. Black-Pond testified that a dual relationship need not be concurrent to be troublesome, and it does not matter if actual damages or negative consequences do not result from a dual relationship; rather, it is the risk that is created and the potential for harm that must be assessed.[9]

With respect to TH's being given keys and access to the building, Black-Pond opined that Engel failed to consider the impact on and risks posed to colleagues, employees, other BHG clients, and TH and CS themselves. She noted TH had a criminal history, client files and information were subject to possible review resulting in an invasion of privacy, and prescription medicines and controlled substances were accessible by TH and CS—two persons who had drug abuse histories. Black-Pond was concerned that TH did not grasp on boundaries well, which became evident when he was found sleeping in a BHG office. Black-Pond noted that the risks were heightened by TH's and CS's being together, and she was of the view that both of them should have been referred to social workers other than Engel.

In regard to the motel payment by Engel, Black-Pond opined that his role should have been to educate TH and CS about housing options and resources as opposed to Engel's personally meeting their needs, which had the potential of creating a dependency relationship. Black-Pond believed that paying for the motel room as compensation for the construction work complicated matters and the relationship between Engel and TH. Black-Pond concluded that Engel's conduct constituted a violation of the general duty to exercise due care, MCL 333.16221(a), a failure to conform to minimal standards of acceptable and prevailing practice for the profession of social work, MCL 333.16221(b)(*i*) and MCL 333.16106(1), and engagement in a dual relationship with a client giving rise to a risk of exploitation or harm, MCL 333.16221(h) and Rule 338.2909(c).

---

[9] The examiner admitted into evidence an article by Frederic G. Reamer entitled Boundary Issues in Social Work: Managing Dual Relationships. The article was discussed during Black-Pond's testimony. We note the following passage:

> Some boundary issues and dual relationships arise out of social workers' genuine efforts to be helpful. Unlike social workers' involvement in sexual relationships or dual relationships that are intentionally self-serving, altruistic gestures are benevolently motivated. Although these dual relationships are not necessarily unethical, they do require careful management using the protocol discussed later. [Reamer, *Social Work: Managing Dual Relationships*, 48 Social Work 1, p 129 (January 2003).]

The article subsequently lists the following protocol: be alert to actual or potential conflicts of interest; inform clients and colleagues about such conflicts and explore remedies that are reasonable; consult professional literature, regulations, policies, ethical standards, and supervisors in order to identify relevant boundary issues and constructive options; design plans of action that address boundary issues and protect involved parties to the greatest extent possible; document all discussions and steps taken to address boundary issues; and develop strategies to monitor implementation of action plans. *Id.* at p 130.

At the conclusion of the hearing, the examiner indicated that he would issue a written decision. And on December 21, 2017, the hearings examiner issued his proposal for decision. The examiner listed 29 findings of fact.[10] The hearings examiner then set forth his conclusions of law. He noted that LARA had the burden to prove the allegations in the administrative complaint by a preponderance of the evidence.

With respect to Count I under MCL 333.16221(a), the examiner concluded that LARA did not establish, by a preponderance of the evidence, a violation of a general duty, negligence, or failure to exercise due care. More specifically, as to hiring TH to relocate a sink in June 2014, the examiner determined that no negative ramifications arose from the job. In regard to hiring TH to make repairs to the building after it was struck by a car, the examiner similarly found that no issues or problems resulted from the employment. With respect to the remodeling work done in December 2014, the examiner noted that CS was discovered using an office phone for personal reasons on one occasion during the project; however, CS was not given permission or authorization to be in the receptionist's office where the phone was located and Engel told CS

---

[10] Most of these facts were alluded to above, and we shall set them forth here in abbreviated form in a single series separated by semicolons. The examiner found as follows: Engel was teaching a parenting class in April 2014 through Love, Inc.; TH and CS, boyfriend and girlfriend, attended the class by way of a referral through court proceedings; Engel taught the class through June 10, 2014; Engel hired TH in June 2014 to move a sink in the BHG building; Engel started seeing CS individually on July 1, 2014, in Engel's professional capacity as a social worker; Engel referred TH to Porenta, LMSW, as a client in July 2014; Engel hired TH to perform repairs to the BHG building in September 2014 after a car crashed into the building; Porenta saw TH for the last time on October 20, 2014; Engel hired TH to remodel parts of the building in December 2014; the remodeling project lasted two months; CS was found in the BHG building in December 2014 using a phone in a receptionist's office absent permission; CS had her last social work appointment with Engel in March 2015; Engel hired TH in October 2015 to perform some exterior work on the BHG building; TH was later discovered sleeping in an empty office in the building in October 2015; CS was also found in the office, along with food and personal belongings; Engel did not give TH permission to sleep in the building; TH was thereafter terminated relative to the exterior construction project; Engel utilized his credit card in October 2015 to pay for lodging for TH at a motel; the payment for lodging was a partial payment for construction work performed by TH; TH started seeing Engel on December 4, 2015, in Engel's capacity as a social worker; the bureau sent a cover letter and subpoena to Engel on February 9, 2016, requesting all records pertaining to TH for the period of January 1 through November 30, 2015; Engel contacted the bureau on February 23, 2016, "and stated that he did not have records for TH for the time period requested"; the bureau sent another letter and subpoena to Engel on February 29, 2016, asking for *any* records pertaining to TH, with a deadline date of March 14, 2016; the bureau did not receive the requested documents by the due date; the bureau phoned and spoke to Engel about the unanswered second subpoena on March 14, 2016; the bureau requested and obtained Engel's fax number and faxed the second subpoena to him; the bureau still did not receive the subpoenaed documents from Engel; and Engel informed a bureau investigator on June 15, 2016, that he had received both subpoenas.

-8-

afterward that this was not acceptable. With regard to the work on the exterior of the building in September and October 2015 and the discovery of TH sleeping in an empty office, along with the presence of belongings and CS, the examiner observed that TH was immediately terminated as the contractor on the project. The hearings examiner rejected LARA's argument that simply hiring TH for any project constituted negligence. The examiner reiterated that TH performed the projects themselves without incident and that Engel effectively addressed the matters involving the phone use and sleeping in the office. The examiner noted that "[i]f hiring an individual with trouble in their past constitutes negligence, woe to anyone with a professional license who tries to give someone a chance."

As to Count II under MCL 333.16221(b)(*i*), the hearings examiner first determined that while LARA's expert Black-Pond clearly had knowledge of the minimal standards of practice, she did not adequately explain "the application of those standards to the circumstances surrounding this matter." In regard to hiring TH to perform the various construction projects, the examiner reached the same conclusions that he did in relation to addressing Count I. With respect to LARA's contention that TH and CS stayed in a motel room purchased with Engel's credit card and that they were kicked out because CS engaged in prostitution, the examiner found that there was no credible evidence that the couple had in fact been kicked out of the motel for participating in prostitution. He also stated that there was no evidence that Engel had any knowledge that prostitution was allegedly occurring until later. The examiner further observed that TH and CS were not Engel's clients at the time they were staying at the motel. The examiner additionally indicated that he failed to see how the method that Engel chose to pay TH for his construction services (covering the motel cost) had "any bearing on [Engel's] license to practice as a social worker." The examiner concluded that LARA failed to prove, by a preponderance of the evidence, that Engel's conduct constituted incompetence, i.e., that he failed to adhere to the minimal standards of conduct.

With regard to Count III under MCL 333.16221(h) and the alleged improper dual relationship between Engel and TH—employer/employee and social worker/client, the hearings examiner concluded that there was no overlap between the period when there was a business relationship and the period when there was a social worker/client relationship. The examiner accepted, however, that a dual relationship between Engel and TH had existed, because Engel taught the parenting class and could have been "viewed as a professional in the social work capacity." Therefore, "a relationship in that sense was established." But, according to the examiner, "in order for there to be a violation, the dual relationship must also pose a risk of exploitation or harm to the client." The examiner stated that he did not find Black-Pond "particularly persuasive" and that there was no evidence showing that TH "felt that he was at risk of being harmed or exploited by the relationship [with Engel]."[11] The examiner pointed out that TH was apparently still comfortable enough with Engel to seek social work services from him after the employment relationship was terminated. The examiner then concluded that LARA

---

[11] The examiner noted that TH and CS did not testify; therefore, he could not assess their perceptions of the relationships they had with Engel and whether they felt exploited or threatened with harm because of the relationships.

failed to show, by a preponderance of the evidence, that the dual relationship posed a threat of harm or exploitation to TH. Finally, the examiner found that Engel did not have a dual relationship with CS, where CS was only TH's girlfriend, not his wife, and where CS did not have a business relationship with Engel.

With respect to Count IV under MCL 333.16221(i) and the subpoenas, the hearings examiner first rejected Engel's argument that the subpoenas had to be personally delivered or served by certified mail, return receipt requested, as reflected in MCR 2.105. Next, the examiner found credible the testimony of the bureau's regulation agent who claimed that Engel admitted in an interview that he received both subpoenas. Accordingly, the examiner concluded that Engel failed to respond to the second subpoena and that LARA therefore proved, by a preponderance of the evidence, that Engel violated MCL 333.16221(i) by failing to timely produce the subpoenaed records.

On January 11, 2018, Engel filed an exception to the examiner's proposal for decision, challenging the conclusion that he violated MCL 333.16221(i) by failing to respond to the subpoena. On January 12, 2018, LARA filed its own exceptions, challenging the examiner's determinations that it failed to establish Counts I, II, and III. In light of the exceptions, the matter went to the subcommittee for resolution.

On July 24, 2018, the subcommittee, having entertained the parties' arguments and exceptions, issued its findings of fact and conclusions of law. The subcommittee accepted in full the findings of fact made by the hearings examiner. See footnote 10 above. The subcommittee also accepted the examiner's conclusion of law that Engel failed to respond to the second subpoena in violation of MCL 333.16221(i). The subcommittee, however, rejected the examiner's conclusions of law that LARA failed to prove the first three counts under MCL 333.16221(a), (b)(*i*), and (h). The subcommittee was persuaded by the testimony of Black-Pond that Engel acted inappropriately. The subcommittee stated that Engel's act of giving TH a key to the building allowed him access to the contents of the building, "potentially including confidential patient information and medications, which included controlled substances." According to the subcommittee, this posed a risk to TH and CS because they "both had a history of substance usage."

The subcommittee next indicated that under minimum standards of acceptable and prevailing practices, Engel was required to inform TH "of potential boundary issues and have a discussion with him about those," yet nothing in the record showed that Engel had done so. The subcommittee proceeded to discuss the motel matter and TH's and CS's housing situation. The subcommittee accepted Black-Pond's view that Engel should have explored housing options with TH and CS that did not include Engel himself meeting their needs. The subcommittee also discussed Black-Pond's testimony that the business relationship between TH and Engel complicated matters because Engel may have created a dependency by his taking care of TH's basic needs rather than educating TH on how to take care of them himself.

Additionally, the subcommittee agreed with Black-Pond's testimony that the dual relationship between TH and Engel could have resulted in a risk of exploitation or harm to TH, to Engel's colleagues, and to Engel himself. Furthermore, according to the subcommittee, there was no evidence of Engel's "attention to potential conflict or to discussions with anyone related

-10-

to ensuring safety and low risk." The subcommittee determined that based on the credible and persuasive testimony of Black-Pond and upon review of the entire administrative record, LARA proved by a preponderance of the evidence the first three counts and allegations of the complaint under MCL 333.16221(a), (b)(*i*), and (h).

On August 1, 2018, the subcommittee issued its final order. The subcommittee reviewed the procedural history of the case and summarized its findings of fact and conclusions of law. For violation of MCL 333.16221(a), (b)(*i*), (h), and (i), the subcommittee placed Engel on probation for one year with various conditions and fined him $2,000. Engel appeals by right.

## II. ANALYSIS

### A. STANDARDS OF REVIEW AND STATUTORY CONSTRUCTION

Rulings by a disciplinary subcommittee in regard to regulated professionals are reviewed on appeal pursuant to Const 1963, art 6, § 28. *Bureau of Prof Licensing v Butler*, 322 Mich App 460, 464; 915 NW2d 734 (2017); *Dep't of Community Health v Anderson*, 299 Mich App 591, 597; 830 NW2d 814 (2013); *Dep't of Community Health v Risch*, 274 Mich App 365, 371; 733 NW2d 403 (2007). Const 1963, art 6, § 28, provides:

> All final decisions, findings, rulings and orders of any administrative officer or agency existing under the constitution or by law, which are judicial or quasi-judicial and affect private rights or licenses, shall be subject to direct review by the courts as provided by law. This review shall include, as a minimum, the determination whether such final decisions, findings, rulings and orders are authorized by law; and, in cases in which a hearing is required, whether the same are supported by competent, material and substantial evidence on the whole record.

A court is required to review the entire record, not just the portions of the record that support an agency's findings, when determining whether the agency's decision was supported by competent, material, and substantial evidence on the whole record. *Butler*, 322 Mich App at 464; *Risch*, 274 Mich App at 372. "Substantial evidence" is defined as evidence that a reasonable person would find acceptably sufficient to support a conclusion, and this may be substantially less than a preponderance but more than a scintilla of evidence. *Butler*, 322 Mich App at 465; *Risch*, 274 Mich App at 372. The Court in *Risch* further explained:

> Moreover, if the administrative findings of fact and conclusions of law are based primarily on credibility determinations, such findings generally will not be disturbed because it is not the function of a reviewing court to assess witness credibility or resolve conflicts in the evidence. A reviewing court may not set aside factual findings supported by the evidence merely because alternative findings could also have been supported by evidence on the record or because the

court might have reached a different result. [*Risch*, 274 Mich App at 372-373 (citations omitted).[12]]

"Under this test, it does not matter that the contrary position is supported by more evidence, that is, which way the evidence preponderates, but only whether the position adopted by the agency is supported by evidence from which legitimate and supportable inferences were drawn." *McBride v Pontiac Sch Dist (On Remand)*, 218 Mich App 113, 123; 553 NW2d 646 (1996). And "an appellate court must generally defer to an agency's administrative expertise." *Anderson*, 299 Mich App at 598. "For purposes of Const 1963, art 6, § 28, a decision is not 'authorized by law' when it is in violation of a statute or a constitutional provision, in excess of an agency's statutory authority or jurisdiction, made upon unlawful procedure that results in material prejudice, or when it is arbitrary and capricious." *Butler*, 322 Mich App at 465, citing *Northwestern Nat'l Cas Co v Comm'r of Ins*, 231 Mich App 483, 488; 586 NW2d 563 (1998).

To the extent that statutory construction plays a role in our analysis and holding, we apply de novo review with the goal being to discern the intent of the Legislature based on the plain language of the statute being examined. *Kemp v Farm Bureau Gen Ins Co of Mich*, 500 Mich 245, 252; 901 NW2d 534 (2017). And if statutory language is unambiguous, the Legislature must have intended the meaning clearly expressed, which then mandates us to enforce the statutory provision as written. *Id.* Finally, Engel challenges the determination by the hearings examiner that Black-Pond qualified as an expert in the field of general social work. We review for an abuse of discretion a trial court's ruling concerning the qualifications of a proposed expert witness to testify in a proceeding. *Woodard v Custer*, 476 Mich 545, 557; 719 NW2d 842 (2006). A trial court abuses its discretion when the challenged decision results in an outcome falling outside the range of principled and reasonable outcomes. *Id.*

## B. STATUTORY SCHEME – SUBCOMMITTEE DISCIPLINARY PROCEEDINGS

LARA filed the administrative complaint against Engel on the basis of MCL 333.16221, which, at the time the complaint was filed, provided in relevant part as follows:

> The department shall investigate any allegation that 1 or more of the grounds for disciplinary subcommittee action under this section exist, and may investigate activities related to the practice of a health profession by a licensee, a registrant, or an applicant for licensure or registration. The department may hold hearings, administer oaths, and order the taking of relevant testimony. After its investigation, the department shall provide a copy of the administrative complaint to the appropriate disciplinary subcommittee. The disciplinary subcommittee shall

---

[12] With respect to the principle that we must generally defer to the credibility assessments of the agency or subcommittee, we cannot help but note a somewhat nonsensical aspect of the principle. A hearings examiner actually observes the witnesses and hears the testimony, not the subcommittee. Indeed, the subcommittee is in no better position than this Court relative to assessing the credibility of witnesses.

proceed under section 16226 if it finds that 1 or more of the following grounds exist:

(a) Except as otherwise specifically provided in this section, a violation of general duty, consisting of negligence or failure to exercise due care, including negligent delegation to or supervision of employees or other individuals, whether or not injury results, or any conduct, practice, or condition that impairs, or may impair, the ability to safely and skillfully engage in the practice of the health profession.

(b) Personal disqualifications, consisting of 1 or more of the following:

(*i*) Incompetence.[13]

* * *

(h) A violation, or aiding or abetting in a violation, of this article or of a rule promulgated under this article.[14]

(i) Failure to comply with a subpoena issued pursuant to this part . . . . [2014 PA 411[15]]

MCL 333.16231 authorizes the issuance of a complaint against a licensee for an alleged violation of MCL 333.16221. See *Butler*, 322 Mich App at 465. And MCL 333.16231a provides for a hearing on the complaint before a hearings examiner. The examiner "shall determine if there are grounds for disciplinary action under section 16221 . . . ." MCL 333.16231a(2). The examiner must "prepare recommended findings of fact and conclusions of law for transmittal to the appropriate disciplinary subcommittee." *Id.*; see also *Butler*, 322 Mich App at 465. "The hearings examiner shall not recommend or impose penalties." MCL 333.16231a(2). "In imposing a penalty . . ., a disciplinary subcommittee shall review the recommended findings of fact and conclusions of law of the hearings examiner." MCL

---

[13] "Incompetence" is statutorily defined as "a departure from, or failure to conform to, minimal standards of acceptable and prevailing practice for a health profession, whether or not actual injury to an individual occurs." MCL 333.16106(1).

[14] LARA cited Mich Admin Code, R 338.2909(c), in alleging a violation under MCL 333.16221(h). Rule 338.2909(c) was rescinded in 2016 after the complaint was filed. 2016 MR 4. At the time of the conduct alleged to have violated Rule 338.2909(c), the rule provided that prohibited conduct for a social worker included "[i]nvolvment in a dual relationship with a client or a former client and/or a client's or former client's immediate family in which there is a risk of exploitation or harm to the client." 2005 AACS.

[15] MCL 333.16221 has been amended several times since the complaint was filed; however, the provisions implicated in this case have largely remained unchanged. See 2016 PA 379; 2017 PA 75; 2017 PA 246; 2017 PA 247; 2017 PA 249; 2018 PA 463.

333.16237(1). Pursuant to MCL 333.16237(3), "[i]n reviewing the recommended findings of fact and conclusions of law of the hearings examiner and the record of the hearing, a disciplinary subcommittee may request the hearings examiner to take additional testimony or evidence on a specific issue or may revise the recommended findings of fact and conclusions of law as determined necessary by the disciplinary subcommittee, or both." "A disciplinary subcommittee is not permitted to conduct its own investigation or to take its own additional testimony or evidence." *Butler*, 322 Mich App at 466, citing MCL 333.16237(3). MCL 333.16237(4) provides:

> If a disciplinary subcommittee finds that a preponderance of the evidence supports the recommended findings of fact and conclusions of law of the hearings examiner indicating that grounds exist for disciplinary action, the disciplinary subcommittee shall impose an appropriate sanction . . . . If the disciplinary subcommittee finds that a preponderance of the evidence does not support the findings of fact and conclusions of law of the hearings examiner indicating that grounds exist for disciplinary action, the disciplinary subcommittee shall dismiss the complaint. A disciplinary subcommittee shall report final action taken by it in writing to the appropriate board or task force.

When a disciplinary subcommittee finds the existence of one or more of the grounds set forth in MCL 333.16221, the subcommittee is authorized under MCL 333.16226(1) to impose various sanctions against the licensee, including probation and fines.

## C. DISCUSSION AND RESOLUTION

### 1. MCL 333.16221(i) – SUBPOENAS

Engel first argues that he did not violate MCL 333.16221(i) because the subpoenas were not validly served under MCR 2.105, and he never actually received the second subpoena.

We initially note that the subpoenas were not personally served on Engel, nor were they mailed to him by certified mail, return receipt requested. Rather, the subpoenas were sent by ordinary first-class mail. The second subpoena was accompanied by a letter from LARA which advised that the Ingham Circuit Court had authorized the subpoena pursuant to a petition filed by the Department of Attorney General and which requested Engel to complete the acknowledgment of service on the subpoena and return it to LARA within seven days. The subpoena indicated that it was issued under the Public Health Code. Section 16235(1) of the Public Health Code provides that "[u]pon application by the attorney general . . ., the circuit court may issue a subpoena requiring a person to . . . produce books, papers, or documents pertaining to [an] . . . investigation." MCL 333.16235(1).[16] The statute does not address the

---

[16] The provision regarding failure to comply with a subpoena, MCL 333.16221(i), specifically and only concerns subpoenas issued pursuant to Part 161 of Article 15 of the Public Health Code, and MCL 333.16235 is found in Part 161.

manner of service of a subpoena.  LARA argues that MCL 333.16192(2) governs service of a subpoena under the Public Health Code.  MCL 333.16192(2) provides in part:

> The department may serve a notice of hearing or a complaint on an applicant, licensee, or registrant in an action or proceeding for a violation of this article . . . by regular mail and by certified mail, return receipt requested, to the applicant's, licensee's, or registrant's last known address, by serving the notice on the applicant, licensee, or registrant, or by making a reasonable attempt to serve the notice on the applicant, licensee, or registrant.

As reflected in the statutory language of MCL 333.16192(2), there is no mention of the service of subpoenas, only notices of hearing and complaints.  The plain language of the statute does not cover subpoenas.  *Kemp*, 500 Mich at 252.  We also note that the language of MCL 333.16192(2) is rendered somewhat unclear by its referring to service "by regular mail *and* by certified mail, return receipt requested" (emphasis added), instead of using the disjunctive "or."[17]

MCR 2.506(G)(1) provides that "[a] subpoena may be served anywhere in Michigan in the manner provided by MCR 2.105."  And MCR 2.506(G)(2) states that "[a] subpoena may also be served by mailing to a witness a copy of the subpoena and a postage-paid card acknowledging service and addressed to the party requesting service[,]" but "[i]f the card is not returned, the subpoena must be served in the manner provided in subrule (G)(1)."[18]  MCR 2.105(A), which generally addresses service of process on a person, provides for service on an individual "personally" or "by registered or certified mail, return receipt requested, [with] delivery restricted to the addressee."  MCR 2.105(A)(1) and (2).  If MCR 2.506(G)(1) and MCR 2.105(A) apply to the instant case, as Engel urges, then the subpoenas were indeed not validly served on Engel.  MCR 1.103 provides:

> The Michigan Court Rules govern practice and *procedure in all courts* established by the constitution and laws of the State of Michigan. Rules stated to be applicable only in a specific court or only to a specific type of proceeding apply only to that court or to that type of proceeding and control over general rules. [Emphasis added.]

---

[17] MCL 333.16192(2) further provides:

> For purposes of this subsection, if service is by mail, service is effective 3 days after the date of mailing, and nondelivery does not affect the validity of the service if the nondelivery was caused by the refusal of the applicant, licensee, or registrant to accept service.

[18] Engel did not sign any document acknowledging service even though the bureau had requested a signed acknowledgment in the cover letter accompanying the second subpoena.

Here, although the subpoenas were mailed as part of an agency investigation and not a particular court case, MCL 333.16235(1) provides, as noted above, that an agency application for an investigation-related subpoena must be made to a "circuit court." Consequently, it is certainly arguable that a subpoena issued under MCL 333.16235(1) concerns a matter of court procedure. Because the Public Health Code does not appear to address the issue regarding the manner of service of a subpoena, we agree there is some logic in turning to the Michigan Court Rules for guidance. On the other hand, MCR 2.506 is focused on subpoenas that are employed in connection with trials and evidentiary hearings.[19] MCR 2.506(A)(5) provides that "[a] subpoena may be issued only in accordance with this rule or MCR 2.305, 2.621(C), 9.112(D), 9.115(I)(1), or 9.212." Except for the possibility of MCR 2.506 itself, none of these court rule provisions has any applicability to our case.

We decline to resolve the question whether the bureau's subpoenas had to be served in compliance with MCR 2.506(G) and MCR 2.105. Assuming that the bureau did not properly serve the subpoenas on Engel, we nonetheless affirm the finding that Engel failed to comply with the second subpoena. For purposes of MCL 333.16221(i), we deem it sufficient to establish a violation when there is evidence that an intended recipient of a subpoena actually received the subpoena and failed to comply with its directives. The regulation agent who interviewed Engel testified that Engel acknowledged receiving the second subpoena, yet Engel did not produce the requested documents pursuant to the requirements of the subpoena. The hearings examiner found that the regulation agent was a credible witness.

While Engel testified that he never received the second subpoena and saw it for the first time at the June 2016 interview, there was competent, material, and substantial evidence that Engel received the second subpoena and did not comply with its demands. Contrary to Engel's argument that logic dictates that he would have responded had he actually received the second subpoena, the fact that he responded to the first subpoena by phone did not rule out the possibility that he decided against responding to the second subpoena. We hold that the testimony of the regulation agent and the investigator in charge of subpoenas sufficed to prove a violation of MCL 333.16221(i) by a preponderance of the evidence. Moreover, it is not this Court's function to assess witness credibility or to resolve conflicts in the evidence. *Risch*, 274 Mich App at 372-373. It is irrelevant that the evidence also supported an alternative finding or that this panel might have reached a different result. *Id.*

### 2. VIOLATION OF GENERAL DUTY, MCL 333.16221(a), INCOMPETENCE, MCL 333.16221(b)(*i*), AND VIOLATION OF ADMINISTRATIVE RULE REGARDING DUAL RELATIONSHIPS, MCL 333.16221(h)

---

[19] MCR 2.506(A)(1) provides:

> The court in which a matter is pending may by order or subpoena command a party or witness to appear for the purpose of testifying in open court on a date and time certain and from time to time and day to day thereafter until excused by the court, and to produce notes, records, documents, photographs, or other portable tangible things as specified.

We have grouped our discussion of MCL 333.16221(a), (b)(*i*), and (h) together because many of the underlying facts LARA relies on to support the first three counts of the administrative complaint apply to more than one of the three statutory provisions implicated in this case.

Initially, Engel argues that Black-Pond did not have the requisite expertise or knowledge to qualify as an expert. At the hearing and after Engel's counsel voir dired Black-Pond, Engel objected to her being qualified as an expert on duty, standards of practice, and ethics, contending that Black-Pond had no more training on those matters than any other licensed social worker who would come before the hearings examiner. The examiner, however, ruled that Black-Pond was qualified "in the field of general social work." In responding to the exceptions LARA filed to the examiner's proposal for decision, Engel mentioned to the subcommittee that he had challenged Black-Pond's qualifications as an expert. But Engel did not ask the subcommittee to review or reverse the examiner's determination on the matter.[20] Therefore, the subcommittee never addressed the issue. The failure to file an exception to a proposal for decision constitutes a waiver of an objection not raised. *Attorney General v Pub Serv Comm*, 136 Mich App 52, 56; 355 NW2d 640 (1984), citing MCL 24.281(3) (a proposal for decision shall become the final decision in the absence of the filing of exceptions). Minimally, the issue was not properly preserved. See *Booth Newspapers, Inc v Univ of Mich Bd of Regents*, 444 Mich 211, 234 n 23; 507 NW2d 422 (1993) (we need not address issues that were not posed in the lower tribunal).

Nevertheless, although our resolution of this appeal will ultimately not rely on our conclusion regarding Black-Pond's status as an expert, we will examine the issue because we find it troubling. We note that LARA fails to address Engel's argument challenging Black-Pond's credentials. MRE 702 provides:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, *a witness qualified as an expert by knowledge, skill, experience, training, or education* may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. [Emphasis added.]

With respect to her qualifications, Black-Pond testified consistently with her curriculum vitae (CV), which was admitted into evidence. She also noted additional training and experiences that were not contained in her CV, which was a bit out of date. Black-Pond is an LMSW and also a licensed professional counselor. She had special training in relation to traumatized children and adults, sensorimotor psychotherapy, and intergenerational trauma. Black-Pond had given presentations on various aspects of trauma, including trauma assessment, treatment, and exposure strategies. She had been employed as a child welfare worker, a forensic interviewer,

---

[20] In Engel's exception to the proposal for decision, he understandably focused exclusively on the subpoena issue, making no claim that Black-Pond should not have been qualified as an expert.

and she was currently the clinical director at the Children's Trauma Assessment Center at Western Michigan University. Black-Pond had authored papers on alexithymia, which is a communication disorder, and on best practices in child welfare systems in connection with serving traumatized children. She was a member of the International Society of Traumatic Stress Studies. Black-Pond testified that she had been qualified as an expert in a similar administrative hearing four or five months earlier. She further testified:

> [I] am also a qualified expert in the area of assessing and treating sexually abused children and children who have otherwise been traumatized, as well as in the area of domestic violence, and testify pretty regularly in Kalamazoo and Cass . . . and other counties.

LARA then sought to have Black-Pond qualified as an expert in social work. Before the hearings examiner ruled, he allowed Engel's attorney to voir dire Black-Pond. Engel's counsel asked whether she had any training or education in ethics and standards in social work. Black-Pond responded that as an LMSW she had completed required ethics training. When asked whether she had any education and training in ethics beyond that required of all LMSWs, she stated, "I do not have any other specialized course work." With respect to testifying as an expert months earlier in a similar administrative hearing, Black-Pond testified that the case involved the failure to comply with the general standards of practice. She observed that she had read the Reamer article on boundary issues and dual relationships. Indeed, Black-Pond agreed that the article formed the basis for her opinion in the instant case. Engel proceeded to challenge Black-Pond's qualifications to give expert testimony in the case, and the hearings examiner made his ruling to qualify her as an expert in the field of general social work.

We agree with Engel's challenge. Although Black-Pond certainly has some impressive credentials, they are related to the areas of trauma and abuse, with a focus on children. Black-Pond did not appear to have any more expertise in the field of social work ethics and standards of practice than Engel, who testified to his belief that he had not been negligent, incompetent, or otherwise in violation of the standards of practice. We also question the hearings examiner's determination to qualify Black-Pond as an expert in "general" social work when the crux of the case concerned ethical standards and the violation of duties relative to social workers. The record seems to reflect that Black-Pond garnered her "expertise" to give opinions in this case solely and simply by reading the Reamer article. Given the record, the hearings examiner should not have qualified Black-Pond as an expert for purposes of the specific issues posed in the case.

Finally, even if Black-Pond were qualified to give expert testimony, we hold that the subcommittee's findings and rulings were not supported by competent, material, and substantial evidence on review of the whole record. The two broad areas of conduct giving rise to LARA's action were (1) the employment of TH to engage in the four construction projects—moving the sink, repairing the car crash damage, remodeling the north side of the building, and working on the roofing and exterior project—and (2) providing the funding for the motel stay. The expressed concerns stemming from this conduct were (1) the alleged creation of a dual relationship between Engel and TH, (2) possible conflicts of interest, (3) access to the building that potentially compromised client files and records and placed medications and controlled substances within the reach of TH and CS, (4) the crossing of boundaries, and (5) prospects of dependency on Engel.

Although we agree with the examiner's conclusion that LARA failed to establish the first three counts of the complaint by a preponderance of the evidence, we note there were problems with respect to the examiner's proposal for decision in that he took a "no harm no foul" approach to the case. The relevant provisions in MCL 333.16221 concern negligent conduct, failure to conform to standards of acceptable practice, and dual relationships that create a risk of exploitation or harm.[21] Whether harm, exploitation, damages, or injury actually occurs is not relevant to the inquiry; we are not addressing the elements of a tort. MCL 333.16221(a) specifically provides that a violation on the basis of negligence can occur "whether or not injury results."

The record supports the inescapable conclusion that Engel's primary intent in hiring TH for the construction projects and in covering the motel costs was altruistic. There was no evidence to the contrary. Moreover, as supported by Black-Pond's testimony and the Reamer article, there was nothing *inherently or intrinsically* improper about Engel's hiring TH to perform the construction work and paying for the motel room.

Accepting the premise that dual relationships need not be concurrent as asserted by Black-Pond, we find it clear that a dual business/client relationship existed between Engel and TH considering the construction projects and that Engel formally accepted TH as a client for purposes of his social work practice on December 4, 2015. We question whether LARA proved the existence of a dual relationship before December 4, 2015, at which time the construction projects had all been completed. With respect to whether the parenting class created a social worker/client relationship between TH and Engel, Black-Pond indicated that it could have done so based on the surrounding circumstances and TH's perception of those circumstances. There was, however, no testimony regarding TH's perceptions. In regard to the intake meeting between Engel, TH, and CS in June 2014, Engel testified that the purpose of the meeting was to assess whether he should or could accept TH and CS as clients. Ultimately, Engel did not take TH as a client at that time. Additionally, Engel testified that he made clear to TH that TH's participation in some of Engel's sessions with CS were not as a client; only CS was his client. We note that the parenting class ended in June 2014, TH had his last session with Porenta in October 2014, and the remodeling project did not start until December 2014, with the exterior project commencing nearly ten months later in the fall of 2015. Nevertheless, assuming the existence of a dual relationship before December 4, 2015, we reiterate that dual relationships are not inherently or intrinsically improper.

---

[21] With respect to rescinded Rule 338.2909(c) and its prohibition against certain dual relationships, Engel argues that because the rule was rescinded, he should not be subject to its reach. We conclude that this argument lacks merit. First, Rule 338.2909(c) was in effect when Engel participated in the conduct at issue. Second, the testimony of Black-Pond and the Reamer article make clear that engaging in particular dual relationships can generally constitute failure to exercise due care and failure to conform to minimal standards of practice even without contemplating any specific administrative rule barring such dual relationships.

Black-Pond and the subcommittee relied on Engel's asserted failure to *manage* the dual relationship given that there was no information that he had discussions or took steps to minimize or eliminate potential problems regarding dependency, conflicts of interest, and boundaries. We first note, and there is no dispute, that LARA had the burden of proof. MCL 333.16237(4). Our examination of the record reveals that when questioning Engel at the hearing, LARA did not ask Engel any questions concerning actions he took to manage the dual relationship so as to avoid potential dependency, conflict-of-interest, and boundary problems. Neither did LARA produce TH and CS as witnesses; consequently, we have no evidence as to their observations, thoughts, concerns, and recollections relative to Engel's managing potential problems. Black-Pond conceded that she had no information regarding the nature of discussions that Engel may have had with TH and CS. Engel's testimony on direct examination by his own attorney provided the only evidence on Engel's management of the assumed dual relationship, and it was entirely ignored by the subcommittee.

Engel answered in the affirmative when asked whether he had any discussions with TH regarding perceived conflicts or issues about doing work for Engel and then becoming his client. Engel noted that he did not observe any stress on TH's part in regard to performing the construction work. The following passage comes from Engel's testimony:

> [D]ual practice is not an intrinsic problem. [D]ual relationship[s] exist[] all the time. You know, it's a common happening, a common circumstance. And you know, [Black-Pond] did say that you have to manage that. She also said that she sees no evidence that I managed that. And . . . my response to that is that no one asked me any questions related to what I did to protect TH and CS.

> \* \* \*

> [D]ual relationships happen all the time. You have to manage them. You have to pay attention to them. I have done that with TH and CS. I worked consistently all the time to do what was in their best interest.

> And . . . the other is that [Black-Pond] talks about boundary violations and crossings. And she presents . . . those without . . . making clear[,] as Reamer does[,] that boundary crossings . . . happen all the time. . . . We need to be aware of them and manage them. In point of fact, I did. And again, I always, I always worked for the best interest of my clients. I have been a social worker for 45 years. And that's where I come from.

This concluded Engel's direct examination by his counsel. LARA's attorney expressly declined cross-examination. When Engel had earlier been examined as part of LARA's case in chief, he was asked no questions about what he did or did not do to manage any potential problems related to a dual relationship. There was not a scintilla of evidence that Engel mismanaged the dual relationship.

Next, the subcommittee observed that Engel's act of giving TH a key to the building allowed him access to the contents of the building, "potentially including confidential patient information and medications, which included controlled substances." This, according to the

subcommittee, posed a risk to TH and CS because they "both had a history of substance usage." The problematic aspect of these findings is that LARA presented no evidence that medications and controlled substances were actually accessible by TH and CS, even though they had access to the building and unlocked offices. Engel's testimony suggested that all drugs were kept in locked cabinets or closets, and there was no testimony to the contrary. The same is true with respect to client files and records—there was no testimony that they were not kept under lock and key or in secured desks or cabinets. And as far as managing the situation to prevent an intrusion, Engel testified that Cochrane-Hoekstra and Wilkins were informed that TH had a key and that the office manager was given direction to make sure that interior doors needed to be locked. We additionally point out that with regard to the remodeling project that led to CS's using an office phone, it was a unanimous vote of the members that resulted in the project's being awarded to TH, not Engel's own doing. Further, with respect to the roofing and exterior project, the record shows that Wilkins was fully aware that TH was performing the construction and that he had a key to the building, yet an interior door on Wilkins's side of the building was left unlocked.

In regard to Engel's paying for the motel room, we first note that Engel exercised reasonable discretion by refusing to hand over cash as TH had initially requested. Further, Engel was faced with a situation where TH and CS were desperate for shelter, and Engel, instead of turning his back on the couple, assisted them with obtaining lodging, which was entirely reasonable given that money was owed or would be owed to TH for his construction services. Black-Pond's testimony and the subcommittee's conclusion that compensating TH for construction work by paying for the motel "complicated" matters and may have created a dependency relationship befuddles us; it was simply another form of payment that was quantifiable and directed for a legal, useful purpose. As with much of LARA's case against Engel, it did not provide any evidence that TH or CS had not previously been educated regarding housing resources, options, or opportunities by Engel or other professionals—TH and CS did not testify and Engel was not examined on the subject. We wholeheartedly agree with the examiner's statement that Black-Pond did not adequately explain the application of the standards of practice to the particular facts in this case.

We affirm in part and reverse and remand in part for the subcommittee to enter an amended or new final order consistent with this opinion and to reevaluate the issue of sanctions in light of this opinion and the singular violation. We do not retain jurisdiction. Neither party having fully prevailed on appeal, we decline to award taxable costs under MCR 7.219.

/s/ Michael J. Kelly
/s/ Jane E. Markey

-21-